JiDECUIR, Judge
Harry Falcon, Harriet Falcon, and Allstate Insurance Company appeal the judgment of the trial court granting plaintiffs’ motion for judgment notwithstanding the verdict.
This appeal arises out of an automobile accident on April 9, 1993, involving three vehicles all traveling in the same direction on Ambassador Caffery Parkway in Lafayette, Louisiana. The accident occurred when the vehicle driven by plaintiff Cheryl Neal was rear-ended by a vehicle owned by defendant Harry Falcon and driven by his then minor child, Harriet Falcon. The impact pushed the Neal vehicle into the rear of a vehicle driven by Donald Granger. Plaintiff Maria Neal was a rear seat passenger in the vehicle driven by her daughter, Cheryl Neal. After trial on the merits, the jury returned a verdict assessing Harriet Falcon with 100% fault. The jury made the following awards: Cheryl Neal
General Damages
[ ¡^Including physical and mental pain, both past and future, disability, and loss of enjoyment of life.) $ 7,500.00
Special Damages
(Including medical expenses, both past and future and past loss of income.) 11,367.82
Maria Neal
General Damages
(Including physical and mental pain, both past and future, disability, and loss of enjoyment of life.) $ 5,000.00
Special Damages
(Including medical expenses and loss of income, both past and future.) 9,351.35
The amounts awarded as special damages equal the amount of all medical expenses incurred, the jury apparently rejecting the plaintiffs’ claim for lost wages. Plaintiffs filed a motion for judgment notwithstanding the verdict. The trial judge granted the motion awarding $6,400.00 in lost wages to Cheryl Neal and $36,000.00 to Maria Neal and increasing the general damage award of Cheryl Neal to $65,000 and of Maria Neal to $35,000.
Appellants contend that in granting the JNOV, the trial judge improperly reevaluated and reversed reasonable credibility determinations made by the jury. Appellants also assign as error the trial judge’s refusal to allow evidence of a prior arrest and conviction of Cheryl Neal.

LAW

The criteria for determining when a JNOV is proper is set forth in Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991) as follows:
... A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion hshould be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied ... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial eourt erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether *820 to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

DISCUSSION

Based upon our review of the record, we find evidence opposed to the motion for JNOV of such quality and weight that reasonable men in the exercise of impartial judgment might reach a different conclusion; therefore, we reverse the judgment of the trial judge granting the JNOV and reinstate the jury verdict.
We agree with appellants that the awards for lost wages and general damages are based upon credibility determinations of the jury, and the trial judge erred in substituting his own evaluations of credibility.
Addressing first the issue of lost wages, we note that the trial judge is incorrect in stating in reasons for judgment that plaintiffs’ testimony as to lost wages is un-contradicted. The record is replete with evidence contradicting their claims for lost wages. At the time of the accident, Maria Neal was 64 years old. Both Maria and Cheryl Neal were taken to Medical Center of Southwest Louisiana immediately after the accident. The medical records of Southwest reflect that at the time of the accident |4Maria Neal was “retired”, and Cheryl Neal was “unemployed”. The medical records also lists Cheryl Neal’s occupation as “housewife”. Although, Maria Neal claimed to have earned over $80,000 yearly as a housekeeper prior to the accident, income tax returns for the years preceding the accident do not support such a claim. Furthermore, Maria Neal’s 1993 tax return indicates her occupation as “investor”, and the only income reported is derived from interest and dividend income. A review of the testimony of Maria Neal’s alleged employers, Jimmy Jacobs and Roy Vroom, indicates uncertainty and inconsistencies as to Maria’s work schedule. In fact, Mr. Vroom testified at one point that at the time of the accident, Maria had not been working for a couple of months “probably because he was out of town”. This would be consistent with the information reported in Maria’s 1993 tax return and medical records of Southwest, that is, that she was not employed at the time of the accident.
Cheryl Neal was 39 years old at the time of trial. Prior to the accident she was employed as an assistant bookkeeper earning $1,400 a month, and claims to have been unable to work for approximately four months as a result of injuries sustained in the accident. Cheryl’s claim for lost wages was also contradicted at trial. The record reflects that Cheryl missed the Monday after the accident and two other days in the four months following the accident. When asked if she missed far more days prior to the accident, Cheryl responded “That could be.” Cheryl testified that she moved from Lafayette to Colorado in September of 1993 to live with her mother. Cheryl did not start looking for employment until November 1993, and secured employment in December, 1993. The trial judge awarded lost wages for the entire four months Cheryl was unemployed. The reason Cheryl was unemployed for these four months is in dispute. Cheryl testified on direct examination that she did not seek immediate employment in Colorado because she wanted to give herself time to | 5heal and was concerned about securing employment and then have to request time off for physical therapy. However, Cheryl admitted on cross-examination that she never underwent physical therapy in September or October of 1993, and she never saw a doctor in September of 1993. Furthermore, she admitted that she spent three weeks on a European vacation in September of 1993. The jury made a credibility determination and rejected Cheryl’s claim for lost wages. The trial judge erred in substituting his own credibility evaluation.
Addressing the issue of general damages, we find the jury’s award to be reasonable and supported by the evidence at trial, and the trial judge erred in increasing plain *821 tiffs’ awards for general damages. Considering the inconsistencies and contradictions in the record evidence as to the extent, cause, and duration of Maria’s and Cheryl’s injuries, the facts and inferences do not point so strongly and overwhelmingly in favor of plaintiffs such that reasonable men could not arrive at a contrary verdict.
Medical records of Southwest indicate that immediately after the accident, Maria Neal complained of pain to her nose, face and neck. The diagnosis rendered was facial contusion and cervical strain. X-rays revealed degenerative changes at C5-6 and C6-7. After Maria returned to Colorado, she was seen by Dr. Mark Purnell, orthopedic surgeon, to whom she complained primarily of knee pain and some neck pain. Dr. Purnell recommended physical therapy for the knee and neck. On a subsequent visit, Maria complained of headache and blurred vision. Dr. Purnell recommended a neurological evaluation by a Dr. Burnbaum who found no neurologic deficits. On January 5, 1994, Maria again complained of neck pain, headaches and visual problems. Another neurological was performed by Dr. Scott Emery. On | ¡¡February 2, 1994, Dr. Purnell reviewed Dr. Emery’s report with Maria. Dr. Emery reported mild weakness involving C5-6 innervated muscles and prescribed medication and therapy. Dr. Purnell did not see Maria Neal again until one year later on February 17, 1995, at which time she complained of pain and stiffness in her neck. Dr. Purnell testified that he had a discussion with Maria about the possibility of evaluation for surgery, to which Maria responded that her condition was not bad enough to require surgery. Maria was next seen by Dr. Pur-nell on March 8, 1995, the date of his deposition. Purnell testified that Maria came to see him to “clarify, uh, with me the location of her pain; the type of pain that she was experiencing at the present time.” Dr. Pur-nell never placed any activity restrictions on Ms. Neal, and he never recommended surgery. The exact cause of the degenerative changes in the cervical spine was not established by Dr. Purnell. Dr. Purnell also testified that ankylosis, an abnormal decrease in motion in a joint level, typically takes a significant period of time to develop and is a common finding in elderly people. He also testified that degenerative disc disease is a process which can take place over the course of years without trauma. No return visit was scheduled.
Dr. Scott Emery treated Maria conservatively and indicated at trial that Maria sees him on an “as-needed” basis. Dr. Emery testified that Maria denied any previous neck or head injuries. Maria Neal also denied at trial that she had ever had problems with her neck, headaches or dizziness prior to the accident sued. However, the history related by Maria to Dr. Emery and Maria’s trial testimony is contradicted by medical records of Aspen Valley Hospital. The Aspen Valley records indicate that on July 27, 1990, Maria Neal was involved in a rear-end collision, after which she complained of dizziness, blurred vision, mild headache, and neck pain in the cervical area.
^Finally, Dr. Steven Dinenberg, orthopedic surgeon, conducted an independent medical examination of both Maria and Cheryl Neal. As to Maria, Dr. Dinenberg attributed the degenerative changes at C5-6 and C6-7 to wear and tear, a long term process. Dr. Dinenberg’s impression was cervical strain which was superimposed upon preexisting chronic degenerative disc disease of the cervical spine.
In light of the above evidence, the jury could reasonably have concluded that Maria Neal exaggerated her injuries, including the cause and extent of her injuries attributable to the accident sued upon.
The evidence also reflects that the jury could have concluded that Cheryl Neal exaggerated or misrepresented her injuries as well. Immediately after the accident, Cheryl complained of pain over both knees, headache, and stiffness in the neck. There is no mention of hip or low back pain in the Southwest medical records. One week after the accident, Cheryl was seen by Dr. Clifton Shepard, orthopedic surgeon, who noted that Cheryl denied low back pain. When Dr. Shepard asked about prior injuries, Cheryl stated that she had been involved in an automobile accident five or six years previous, wherein she injured her neck and left shoul *822 der. Dr. Shepard testified that Cheryl told him she did not feel that she “got a complete and total recovery in regards to her neck and her left shoulder from that accident.” Cheryl testified at trial that she actually meant that she had not recovered “psychologically” regarding her neck and shoulder. The jury could have rejected Cheryl’s explanation of her statement to Dr. Shepard.
By April 21, 1993, Cheryl reported to Dr. Shepard that she was not attending physical therapy and she had improved in the areas of her neck and knees. She had full range of motion in the neck at this time. On May 4, 1993, Cheryl again reported improvement in the neck and shoulder, she was working and experiencing nojgdifficulty working. According to Dr. Shepard, by May 18, 1993, all of Cheryl’s complaints to that point had improved. Dr. Shepard testified that Cheryl did not complain of low back pain until July of 1993. He recommended an MRI which revealed a ruptured disc in the lower back. However, Dr. Shepard who was surprised at this finding, could not tell when the herniation occurred. On August 26, 1993, Cheryl reported that she had stopped taking pain medication because she did not feel the need for it. At that point, Cheryl indicated that her condition had improved, including her low back. This was Cheryl’s last visit with Dr. Shepard.
Cheryl was next seen by Dr. Robert Hunter, orthopedic surgeon, who treated her conservatively. Dr. Hunter testified that Cheryl did not complain of low back problems at the initial visit. He last saw Cheryl in February 1995. At that time, Dr. Hunter’s assessment was that Cheryl continued to have low back pain, the exact source of which was unclear. When asked about his prognosis for Cheryl, Dr. Hunter testified that the best case scenario “that’s what I would predict” is that through therapy, Cheryl’s back pain would resolve and she would live pain-free despite the MRI and CT evidence that her spine is not entirely normal. Dr. Hunter refused to characterize Cheryl’s condition as permanent and Dr. Hunter never placed any work or recreational activity restrictions on Cheryl.
Cheryl Neal was also seen by Dr. Robert Derkash, orthopedic surgeon from Colorado. Dr. Derkash saw Cheryl on one occasion at Dr. Robert Hunter’s request. Interestingly, although Cheryl denied low back pain to Dr. Shepard after the accident, she told Dr. Der-kash that she experienced low back pain immediately after the accident of April 1993. Dr. Derkash testified that he would expect low back complaints to begin within several days or perhaps a week or two after the accident if it was related to the accident. Therefore, it is significant that she did not complain |aof low back pain to Dr. Shepard until several months after the accident. Finally, Dr. Derkash testified that chances of surgery are minimal.
Dr. Dinenberg testified that the history related to him by Cheryl Neal conflicted with the records of Southwest Medical Center. Dr. Dinenberg testified that the spurring at C5-6 and C6-7 was an injury related phenomena that probably occurred in a previous accident and this was a long-established problem. He was of the opinion that Cheryl’s low back problem that began in July 1993 is of distant proximity to the relationship of the April 9, 1993 accident. Dr. Dinenberg felt that Cheryl suffered a cervical strain and right hip strain as a result of the April 1993 accident, which he notes was the same opinion of Cheryl’s previous treating physicians.
The record reveals multiple other evidence calling plaintiffs’ credibility into question; however, this court need not and will not mention each and every instance. In light of the contradictory evidence already set forth above regarding the cause and extent of plaintiffs’ injuries, we hold that it was error for the trial judge to grant plaintiffs’ motion for JNOV. Because of the conflicting nature of the evidence, it is impossible to say that reasonable men could not reach different conclusions. Under these circumstances, the granting of a JNOV was improper.
Because we reverse the granting of the motion for JNOV, we need not address appellants’ second assignment of error.
The jury verdict and judgment is hereby reinstated. Costs of appeal are assessed to plaintiffs-appellees.
*823 JNOV REVERSED; JURY VERDICT AND JUDGMENT AFFIRMED AND RENDERED.